By the act relating to the Albany basin, passed April 5th, 1823, (but as it would seem not by a two-third vote,) commissioners were appointed to raise, by subscription, moneys to be expended in the construction of a mole or pier, so as to comprise the basin; they were to select three of their number to be the acting commissioners, one of whom was to be designated as superintendent, who was to collect and receive the moneys to be subscribed, and to pay the same out for the necessary materials and labor, and to be accountable to the board of commissioners: the acting commissioners were authorized to make all the requisite contracts, and to employ the agents, engineers, and laborers. The board of commissioners were required (when the canal commissioners should decide that public convenience should require it,) to construct three bridges across the basin with a draw for each, and to provide some person to open and shut the draw bridges, but no one was to be charged for passing through them. As soon as the work should be finished *Page 176 
the commissioners of the land office were required to grant by letters patent, to the board of commissioners appointed by the act, or to the survivors or survivor of them, as joint tenants,the land under the water of the Hudson river, occupied by themole or pier and sloop lock, subject to the conditions and reservations mentioned in the act, but no toll was to be exacted by the commissioners for any person passing over the bridges, nor any wharfage from the canal boats or rafts entering from the canal, but wharfage was to be paid to them on all other vessels navigating the Hudson river and entering into the basin, one half of which was to be paid to the proprietors of the pier. The pier was to be divided into lots which were to be sold and the proceeds divided among the proprietors. A sloop lock was to be made for the canal boats, and the canal commissioners were to charge tolls on all canal boats entering through it into the basin, and to pay the net avails to the agent of the owners of the pier, to be divided among them. The grant by the commissioners of the land office was to be upon condition that it should be void if the state should refund to the commissioners appointed under the act, the amount expended by them in erecting the mole or pier, bridges and sloop lock within five years. The adjoining proprietors were to have their damages assessed and paid by the commissioners, and the amount was to be deducted out of the wharfage money. The corporation of Albany was authorized to assent to this act, and the common council did so on the 8th of April, 1823.
By the act of April 27th, 1835, (which it was admitted at the trial was not passed by two-thirds vote,) the common council of Albany were authorized, among other things, to widen and construct the draw in the bridges over the basin, and the passages under the same, and it was required that after they should be widened they should not be left in a worse state and condition than they should be in at the time the alteration should be commenced. The improved value, when ascertained by commissioners to be appointed for the purpose, was to be paid by the pier owners, and the bridges, after the improvement, were tobe maintained, kept in repair, and tended as they were by lawrequired to be at the time of the passage of the last act. The *Page 177 
damages of the owners of the adjoining lands were to be paid by the owners of the buildings, lots, wharves, docks and pier lots, benefited by the improvement, who were also to pay all the expenses of such improvement except such as were to be defrayed by the pier company. The common council of Albany, early in 1837, passed an ordinance for building the bridge in question, pursuant to the act of April 8th, 1835. In January, 1837, they made a contract for the construction of the bridge with William W. Van Zandt, who was to perform the labor and furnish the materials. He did so, and as it would appear under the supervision of a committee of the common council, of which Col. McKown was chairman. That gentleman was apprized at the time by the witness Baldwin, and another witness, that some of the timbers of which the bridge was constructed were insufficient. After the bridge had been finished the pier company paid $4000 for the increase in its value, took possession and assumed the control of it, and were continuously in possession of it until and at the time of the accident of which the plaintiff complains. The jury have found that by the carelessness of the defendants in constructing the bridge with weak timbers, it broke and injured the plaintiff in the manner stated in his declaration.
The principal question discussed on the argument was whether, under the circumstances of this case, the plaintiff could maintain his action against the defendants. The act of April, 1835, not having been passed with the assent of two-thirds of the members elected to each branch of the legislature, was unconstitutional, if its effect would be to alter the powers of the corporation. (Const. of New-York, art. 7, § 9.) That act was certainly designed to clothe the corporation with new powers, and so far to alter its charter. The change was of a temporary character, but the constitution makes no difference between that and a more permanent alteration. The evils which it was intended to prevent may readily emanate from an inconsiderate grant of temporary powers, and the probability of improvident legislation is much greater in such case than where it is intended to make a durable change. It was said, however, that the assent of the common council estopped the corporation *Page 178 
from raising this objection. That would be true where the assent is given by persons acting in their own behalf, and who have themselves to pay the damages resulting from their misconduct. They would have of course the right to waive any objection, and ought to be considered as doing so in all cases where they assume the duty, and others suffer directly from their negligence in performing it. But it is I conceive different with a corporation. There the officers act for their constituents, who have to pay when they are responsible at all, and such officers are limited in their legitimate action to the powers conferred by their charters. So long as they confine their agency to such powers, their constituents are responsible for their misfeasance or carelessness, for the plain reason that the constituents have selected the officers, and have intrusted them with the performance of the duties. But the voters cannot, with propriety, be supposed to elect their officers with the intent that they should exceed their legitimate powers; and should such officers do so, whatever may be the rule as to themselves individually, their constituents never having even impliedly given their assent to the act, should not be holden responsible for the consequences. If the common council could not, under the circumstances, bind the corporation expressly, a fortiori they could not conclude them by way of estoppel. The rule, although it may sometimes operate harshly, is a safe and sound one, and should be applied uniformly to all cases of misconduct in persons acting in a representative character, where they travel beyond their legitimate powers.
But it was said that the defendants are liable in the present action on the ground that their charter has conferred upon them, as commissioners of highways, the powers of constructing and superintending the bridge within their corporate limits. To this there are two answers, either of which is sufficient; first, the declaration does not seek to charge them in that capacity; and secondly, their charter refers only to public bridges, and this is a private one. The bridge in question was built for the Pier Company, and was at the time of the accident their property and under the superintendence of their agent. It was undoubtedly used by the public, and so are many franchises, such as *Page 179 
ferries, turnpikes and rail-roads, belonging to individuals and corporations, for the construction and proper management of which the owners and not the public officers having charge of correlative subjects are responsible. It is not material on this point to inquire whether the Pier Company was a corporation or an unincorporated association of individuals. In either capacity they could hold the property, and it is quite evident that it was in their possession and beyond the control of the defendants.
If the act of April, 1835, was unconstitutional, and the defendants are not estopped from availing themselves of that objection, it would follow that the plaintiff cannot sustain this action; but as there may be a difference of opinion on this point it is proper, and may be necessary, to inquire whether, supposing that the act was constitutional, the defendants are responsible to the plaintiff under the circumstances of the present suit. The declaration asserts that it was the duty of the defendants so to construct the bridge that it might be crossed without danger. If so, that would authorize a suit by any one to whom they owed such duty and who had suffered by reason of its non-performance, but most assuredly not by a stranger. To whom, then, was the obligation on the part of the defendants (if any) to build a safe bridge, due? Not certainly to the plaintiff as one of the public, for the bridge was neither built nor paid for by the people of the state, nor were the defendants the agents of the people in this matter; but the work was performed and the materials were found for the Pier Company. Although the agents were nominally selected by the lawmakers, yet the selection was doubtless made at the suggestion of the company; they accepted and paid for the work when it was completed, and it has since been in their possession and under their control, and so far as the evidence goes without any interference by the common council of Albany. The case of The Mayor, c. of New York, v. Bailey, (2Denio, 433,) is in point to show that the common council were under these circumstances the agents of, and owed the duty to, the Pier Company, and that consequently such company could alone maintain the action where the complaint was simply for a breach of such duty. *Page 180 
The court below base the alleged responsibility of the defendants in this suit on the general ground that where one party sustains an injury by the misfeasance of another the sufferer may maintain an action against the wrongdoer for redress. That rule operates where the injury is effected directly by the wrong, or where it results from the malconstruction of some object while it is in the possession or under the control, or in any manner used under the agency or instructions of the party originally in fault. But I know of no case where it has been held that a stranger can recover for damages sustained by reason of the defective construction of an object of the builder, after the title to the object has changed, and it has passed out of his possession, and is no longer subject to his control, and in no way used pursuant to any authority or directions from him. A man builds a carriage carelessly with defective materials. He sells and parts with it, and the purchaser lends it to a friend. The carriage, by reason of the original defect, breaks down, and the friend is injured: can he recover his damage against the maker? A carpenter is hired to build a barn and furnish the materials. He carelessly places a timber slightly defective under the mow, and the barn is accepted by the owner. Some years afterwards the timber, owing to its original defect, breaks and falls upon a laborer, who sustains a serious injury; can he recover of the carpenter? Or, to take a case more nearly parallel with the one under consideration. A turnpike company contract with some one to build a bridge over a creek which their road crosses. The builder erects a defective bridge, and it is accepted and used by the company. Some time afterwards the bridge, while one is travelling over it, gives way by reason of the original defect, and the traveller is injured; can he sustain an action against the builder? I know of no decision which would authorize a recovery under such circumstances. The reason why an action cannot be sustained in such a case is that there is no connection between the wrong done and the person whom it is sought to charge for the consequences. The wrongdoer has not at the time any control over the subject matter, or any power or right to remedy the evil. The damage in all such cases arises in fact from the continued use of *Page 181 
the defective subject, and with that the builder who has parted with the title, possession and control of it, has not and cannot have any thing to do. The entire agency is at the time in the existing proprietors by whom or through whose means the wrong is perpetrated. The principal point was decided in Blunt v.Aiken, (15 Wend. 522.) In that case the defendant, who was at the time the owner of the land, had wrongfully built his mill dam some three or four feet higher than another which had formerly been in the same place. He afterwards parted with the property to his sons, and while it was in their possession the water rose so high, in consequence of the addition to the dam made by the defendant, that it overflowed the plaintiff's land. It was held that as the defendant had parted with the property and others were in possession of it, occupying it as their own when the injury was sustained, the defendant was not liable. That case was not overruled nor its authority shaken by the subsequent decision of the same court in Waggener v. Jermain, (3 Denio, 306.) There it was held that the creator of a nuisance who had sold the property on which it was situated, with a warranty for the continued enjoyment of it as used at the time, was responsible for damages sustained subsequent to his conveyance. The court place their decision on the ground that the covenant of warranty was a clear and strong affirmance of the nuisance in the possession and enjoyment of the grantee. It is unnecessary to inquire whether the reason given in that case was sound, or the decision right. It is sufficient for my present purpose that neither militates against the doctrine which I have laid down. In the case which I am now considering the defendants had nothing to do with the continuance. of the defective bridge, and cannot in my opinion be made responsible for any damage consequent upon such continuance. I am far from being inclined to extend the protection of the law to those who are guilty of negligence in the performance of their engagements or duties. We shall repress that effectually, and, what is of great consequence, appropriately, by holding the offending parties rigidly responsible in cases where they have the control of the subject matter, or the persons with whom they deal. To go further would be to stretch *Page 182 
the rules of law to meet the hardship of individual cases, which I am never disposed to do, however strongly my sympathies may be enlisted for the sufferers.
Upon the whole, I think that the learned judge erred in that part of his charge which affirmed the responsibility of the defendants, after they had surrendered the bridge to the Pier Company, to third persons, and that the judgment must therefore be reversed.
Judgment reversed.¹